NATRONA SERVICE, INC., a Wyoming Corporation, Plaintiff,

v.

CONTINENTAL OIL COMPANY, a Delaware Corporation, Kerr-McGee Corporation, a Delaware Corporation, Phillips Petroleum Company, a Delaware Corporation, Meurer, Serafini and Meurer, Inc., Polaris Company, a division of Meurer, Serafini and Meurer, Inc., John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9, and John Doe 10, Defendants.

No. C75–146–B.

United States District Court,
D. Wyoming.

July 6, 1977.

Robert Jerry Hand and Dennis M. Hand of Hand, Hand & Hand, Casper, Wyo., Lawrence H. Averill, Jr., John E. Stanfield of Smith, Stanfield & Scott, Laramie, Wyo., H. Byron Mock, Salt Lake City, Utah, for plaintiff Natrona Service, Inc.

William T. Schwartz, Casper, Wyo., Richard L. Schrepfermen and Edmond F. Noel, Jr., of Holme, Roberts & Owen, Denver, Colo., J. Derrill Cody and Clydine Cornett, Oklahoma City, Okl., for defendant Kerr-McGee Corp.

Carl L. Lathrop and Nick Kalokathis of Lathrop & Uchner, Cheyenne, Wyo., Thomas M. Blume, Denver, Colo., and Lewis J. Ottaviani, Bartlesville, Okl., for plaintiff Phillips Petroleum Co.

Bruce R. Merrill of Continental Oil Co., Houston, Tex., and Houston G. Williams of Wehrli & Williams, Casper, Wyo., for defendant Continental Oil Co.

Richard L. Harring of Calkins, Kramer, Grimshaw & Harring, Denver, Colo., and Paul J. Hickey of Rooney & Horiskey, Cheyenne, Wyo., for defendants Meurer, Serafini and Meurer, Inc., and Polaris Co., a division of Meurer, Serafini and Meurer, Inc.

## MEMORANDUM OPINION AND ORDER

BRIMMER, District Judge.

This case arises from a dispute in 1974 between the plaintiff, Natrona Service, Inc. and its president, John MacGuire, and his former clients, Kerr-McGee and Continental Oil Company (Conoco) and a competitor of Natrona Service, Inc.'s in the claim-staking and validation business, Meurer, Serafini and Meurer (MS&M). The defendants seek a summary judgment against the plaintiff's complaint alleging violations of the antitrust laws of the United States; it is therefore necessary to detail the facts which the extensive discovery of the parties has brought to light. John MacGuire has been added as a party plaintiff herein.

John MacGuire had built up a substantial claim-staking business, involving the actual staking of claims and, when given the authorization to take a project to completion, the validation of those claims in accordance with appropriate federal and state mining laws. MacGuire designed his operation to perform all tasks necessary to acquire valid mining claims. He called it a "turn-key" operation. Over the years he performed practically all of the claim-staking work in Wyoming in which the major energy companies had engaged. Typically, the energy company, such as the defendants Kerr-McGee and Conoco, would map out a large area of land open for uranium exploration and would contract with Natrona Service, Inc. to stake the lands in that area on its behalf. Until 1974 the plaintiffs had little or no competition in Wyoming, although other firms competed with plaintiffs to do survey work, set discovery monuments, or put in corner and side-corner posts. It is generally agreed that Natrona Service, Inc. did its job well, but conflicts arose between MacGuire and the field representatives of Kerr-McGee and Conoco.

In the spring of 1974, those conflicts began to intensify. MacGuire began to raise the prices for his services substantially. The Casper representatives for Kerr-McGee and Conoco began to protest. Personality conflicts developed between MacGuire and Henry Johnson the district geologist for Conoco in Casper when Johnson accused MacGuire of a conflict of interest because Natrona Service, Inc. had been performing work for Conoco's competitors in an area previously worked for Conoco and had even overstaked some Conoco claims for one of Conoco's competitors which Natrona Service, Inc. itself had staked for Conoco. In turn, MacGuire complained that Johnson would not authorize Natrona Service, Inc. to overstake claims on behalf of Conoco which MacGuire considered invalid.

A similar dispute developed between MacGuire and Kenneth Sandlin, engineering supervisor for Kerr-McGee in Casper, Wyoming. MacGuire had told Sandlin that certain claims which Kerr-McGee was contemplating purchasing from a third party were not valid and suggested that Sandlin give him permission to overstake them. However, Sandlin's superiors ultimately determined that the claims should be purchased from the third party in the interest of economy, and MacGuire was not given the project. MacGuire was angered by the decision and accused Kerr-McGee of improper conduct. Sandlin criticized MacGuire for having overstaked claims on behalf of a competitor which MacGuire had earlier staked for Kerr-McGee. However, despite these disputes Sandlin did sit down with MacGuire and suggest to him another method by which MacGuire could calculate his costs and hopefully bring his prices back into line, at least from Kerr-McGee's point of view. MacGuire did adopt this approach and subsequently was awarded a contract by Kerr-McGee.

Eventually, the escalating prices, the disputes over the overstaking issue, the charges and counter charges of unethical conduct and conflicts of interest, and the pressure from the home offices to keep costs down caused Sandlin and Johnson to look for another firm to compete with Natrona Service, Inc. MacGuire, in his deposition, admitted that those factors, and especially the pressure to keep costs down, were instrumental in the events which were to occur.

In 1973, Sandlin of Kerr-McGee had the opportunity to talk to Ken Wickware, who owned a surveying business and who had expressed an interest in getting into the claim-staking business. Sandlin had advised Wickware as to what equipment he would need, had informed him that MacGuire's operation was a good one to emulate, and had suggested to Wickware that he think seriously about the pitfalls of getting into the business. Nonetheless, Wickware did go into the business under the name of Conard, and in August 1973, he wrote to Sandlin informing him he was in business and soliciting whatever business Kerr-McGee might have to give. However, it was not until April 1974, after the dispute over the price increases MacGuire had made in February, that Sandlin contracted with Wickware and Conard for the claim-staking on Kerr-McGee's Belle Fourche Project in Wyoming. Trouble was just around the corner.

From the outset Conard had problems getting work done quickly, competently and efficiently. By the time the initial surveying on the Belle Fourche Project was completed, Wickware had joined forces with Ronald P. Harris in a joint venture called Polaris Company (Polaris). The two had acquired some drilling equipment, and when Kerr-McGee decided to carry the Belle Fourche Project through to completion, they had been awarded the contract. However, the equipment was not the proper equipment for use in the performance of the validation work, and the management of Polaris was unsatisfactory. When MacGuire's crews came across the claims being staked by Polaris, they reported to MacGuire that the work was not being done properly. MacGuire, in turn, was not dilatory in informing Sandlin of this fact. Sandlin confronted Wickware with this information, and after surveying the project, Wickware informed Sandlin that some of the work would have to be redone.

Meanwhile, Johnson of Conoco had also been looking for alternative to Natrona Service, Inc., especially after MacGuire had increased his prices on a project for Conoco from an initial bid of $65.35 per claim to completion to $92.00 per claim, and after he and MacGuire had gotten into a dispute over MacGuire's having overstaked some Conoco claims for a competitor. Thus, when Johnson was informed by members of a Conoco field crew that they had discovered a new firm which was staking claims for Kerr-McGee, he made inquiries of Kerr-McGee personnel as to who the new contractor was and as to what the quality of his work was. Although the Kerr-McGee people were reluctant to provide such information because Wickware was already un-

der their employ, they did indicate that Wickware was doing the work, that it appeared to be satisfactory, but that it was slow. In June 1974, Conoco awarded its first contract to Wickware or Polaris.

Problems began to compound. The joint venture had simply taken on more work than it could effectively handle, and its lack of experience, proper equipment, competent personnel, and effective management began to take its toll. Simply, the work was not getting done. Claims were having to be "repapered", i. e., relocated, because they could not be validated within the sixty-day period required by the state mining laws. Conoco and Kerr-McGee personnel were growing more and more impatient with the delays and were demanding that the contracts be performed. Polaris was finding not only that it was becoming more and more difficult to deliver but also that it had severely underbid the projects, and that it could not find subcontractors to assist in the validation at the prices it had originally bid.

All the while, MacGuire was protesting to Johnson of Conoco and Sandlin of Kerr-McGee that the work being performed by Wickware or Polaris was not complying with the mining law requirements and urging that what they should do is fire Polaris and hire Natrona Service, Inc. to complete the projects. The defendants respectfully declined and insisted that Polaris had a contract which it was expected to perform.

This is not to say that throughout this period of turmoil, which would run from April and June 1974 to May 1975, Conoco and Kerr-McGee were offering no work whatever to Natrona Service, Inc. To the contrary, they had simply declined to replace Wickware with Natrona Service, Inc. on the projects already under contract to Wickware and Polaris. For example, Kerr-McGee had, after the February price increases and before awarding Wickware the Belle Fourche Project in April 1974, awarded Natrona Service, Inc. two contracts and in September and October 1974, had awarded other contracts to Natrona Service, Inc. Again, in April 1975, Sandlin asked MacGuire if he would be interested in performing a project for Kerr-McGee in California; however, MacGuire informed Sandlin that he had sold his big equipment, so the matter was not pursued. Similarly, despite his earlier statement to MacGuire after the overstaking controversy that MacGuire would never get any more business from Conoco, Johnson did ask MacGuire in the fall of 1974 whether Natrona Service, Inc. would be interested in doing some work for Conoco in the Rock Springs area. However, MacGuire rejected the offer when Johnson informed him that Conoco was willing to pay between $55 and $65 per claim and that Wickware's outfit was the other potential bidder. In fact, upon learning the latter piece of information, MacGuire became incensed and stormed out of Johnson's office.

One final thread in this complex tapestry remains to be weaved, and that is the manner in which MS&M became involved as defendants in this litigation. As has already been detailed, first Wickware as Conard and then Conard and Harris as Polaris were having serious difficulties completing the contracts they had assumed and were having difficulties financially. Moreover, Sandlin for Kerr-McGee and Johnson for Conoco were making serious noises about replacing Polaris. Finally, in the fall of 1974, the Polaris joint venture began negotiations with MS&M, an engineering firm from Colorado, with the intention of selling to MS&M all of the assets of Polaris, including all of the projects currently under contract. At that time, the management of MS&M believed that it had the managerial and financial capabilities to enter the claim-staking and validation business, and based upon the representations of Harris and Wickware that a good potential existed for additional business, MS&M acquired the assets of Polaris in November 1974.

The defendants Conoco and Kerr-McGee were unaware of this transaction. As late as December 1974, Johnson of Conoco had approached MacGuire and inquired whether Natrona Service, Inc. would be willing to help Conoco out if it got into trouble and if

it would be willing to sub-contract under Polaris in order to get the location work completed, but MacGuire had flatly refused. Consequently, in January 1975, Johnson actually informed Wickware that Polaris was not going to keep the contract. It was then that Johnson first learned that MS&M had taken over the projects. Subsequently, management from MS&M conferred with Johnson and obtained permission to complete the contracts and also managed to negotiate an increase in the price to be charged per claim because of the difficulties encountered in validating the claims. This latter development was not unlike the procedure that both Conoco and Kerr-McGee had followed with Natrona Service, Inc. in the past when it became evident that in order to complete a project, Natrona Service, Inc. would have to be paid at a rate which was higher than the parties had originally contemplated.

Kerr-McGee, in the meantime, had learned in late 1974 or early 1975 that MS&M had taken over its contracts with Polaris and that MS&M had contacted Conoco without first completing the outstanding Kerr-McGee Project. Although this development upset Kerr-McGee personnel, after discussions Kerr-McGee also permitted MS&M to continue with the projects originally begun by Wickware and Polaris. However, during this period from November 1974 until May 1975, Kerr-McGee did not award any additional contracts to MS&M, nor did Conoco. Rather, both defendants continued to insist that MS&M complete the projects then under contract.

In May 1975, MacGuire began a systematic campaign of overstaking those claims which had been staked either by Polaris or by MS&M on behalf of Conoco and Kerr-McGee. MacGuire contends that Conoco, Kerr-McGee and MS&M and its predecessors have attempted to drive him out of business and avoid the applicable mining statutes. Consequently, after Conoco had filed an action to determine who had the right to the claims previously staked by Wickware, Polaris, and MS&M on its behalf but overstaked by MacGuire, Natrona Service, Inc. on August 7, 1975, filed its complaint against these defendants and others.

By way of an amended complaint, Natrona Service, Inc. and later John MacGuire, who has joined as a plaintiff, asserted three claims against Conoco, Kerr-McGee, Phillips Petroleum Company, Meurer, Serafini and Meurer, and various John Does. Pursuant to a stipulation, all claims of the plaintiff against Phillips Petroleum Co. (Phillips) have been dismissed with prejudice, and the John Does are no longer a factor in this case. Moreover, at the hearing on the defendants' Motions for Summary Judgment on October 18, 1976, the plaintiffs confessed that the complaint did not state a claim upon which relief could be granted insofar as the plaintiffs' second claim for relief was concerned, and a summary judgment in favor of the defendants on that claim will be entered. Thus, the action as it now stands consists of two claims against the three remaining defendants, Conoco, Kerr-McGee and MS&M, as well as certain separate claims against Kerr-McGee.

In their first claim for relief, the plaintiffs have alleged that these defendants have conspired, combined or contracted for the purposes of restraining trade, monopolizing trade or commerce, or attempting to monopolize trade or commerce in violation of Sections 1 and 2 of the Sherman Antitrust Act, (15 U.S.C. Sections 1 and 2). The essence of the various allegations under this count is that these defendants have entered into a conspiracy, combination, or contract to fix prices in the claim-staking and validation business, or to boycott the plaintiffs' business by concertedly refusing to deal with Natrona Service, Inc., or otherwise to monopolize or attempt to monopolize the claim-staking and validation business.

The plaintiffs' other claim for relief is based upon a common law claim for damages which, plaintiffs contend, arises from the intentional and malicious infliction of temporal damage upon the plaintiffs by acting in an unfair, anti-competitive manner for the express purposes of suppressing competition and of damaging or destroying plaintiffs' business.

Extensive discovery over a period of approximately six months was permitted after the Court denied the defendants' motions to dismiss. The defendants then filed their motions for summary judgment. These motions were argued on October 18 and 19, 1976. After an extensive review of the facts produced by discovery and of the law on the subject, it is the view of the Court that both the evidence, or the lack thereof, and efficient judicial administration require that the defendants' motions for summary judgment be granted.

In granting the defendants' motions for summary judgment, this Court is fully cognizant that summary judgments in antitrust litigation should be sparingly used and are seldom justified. *United States v. Employing Plasterer's Ass'n.*, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954); *Clark v. United Bank of Denver Nat'l Ass'n.*, 480 F.2d 235 (10th Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973). The Court is also aware that where the litigation is complex, where motive and intent play leading roles, where the proof is largely in the hands of the defendants, and where hostile witnesses "thicken the plot," summary judgment should be sparingly used. *Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

However, such admonitions are not warrants "for every plaintiff who can draft an antitrust complaint, no matter how groundless or improbable its allegations, to force his claim to trial despite its deficient factual underpinnings. *Murdock v. City of Jacksonville*, 361 F.Supp. 1083, 1086–87 (M.D.Fla.1973). Where the Court has permitted extensive discovery, and where the requirements of Rule 56, Federal Rules of Civil Procedure, are satisfied, the Court may properly grant a motion for summary judgment. *Umdenstock v. American Mortgage and Inv. Co.*, 495 F.2d 589 (10th Cir. 1974). Moreover, when that discovery has failed to reveal any evidence to support the plaintiffs' claims, and the record contains an overwhelming amount of evidence which contradicts the plaintiffs' conspiracy allegation and poses a variety of non-conspiratori-

al motives, for the defendants' acts, rooted in business judgment, the defendants are entitled to summary judgment. *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Semke v. Enid Auto Dealers' Ass'n*, 456 F.2d 1361 (10th Cir. 1972). When it becomes plain that the allegedly unlawful acts do not exist, and the plaintiffs' claims are without merit, the Court has a duty to grant summary judgment. *Capital Temporaries, Inc. v. Olsten Corp.*, 365 F.Supp. 888 (D.Conn.1973), *aff'd*, 506 F.2d 658 (2d Cir. 1974).

Allegations which are "glib and conclusory" are insufficient to raise genuine issues of material fact once they have been specifically denied in sworn affidavits and depositions. *Kemp Pontiac-Cadillac, Inc. v. Hartford Automobile Dealers' Ass'n*, 380 F.Supp. 1382 (D.Conn.1974). In addition, where the defendants have expressly denied by sworn testimony the plaintiffs' allegations of conspiracy to monopolize or restrain trade, "it [is] up to the plaintiffs to produce *significant probative evidence*—by affidavit or deposition—demonstrating that a *genuine* issue of fact existed as to this element of the complaint, if summary judgment is to be avoided." *Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 778, 782 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975) (Emphasis added.); *ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52 (9th Cir. 1975); *Clark v. United Bank of Denver, supra.* When the plaintiff has alleged "an exclusivity agreement and ulterior motivation, and (defendants) rebutted these allegations by substantial, sworn, reasonable, and believable evidence concerning business dealings and judgment. . . . (and plaintiff) offered nothing else to support his bare assertions," the Court is obligated to grant the motion for summary judgment. *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389, 395 (5th Cir. 1976). The failure of the plaintiffs to come forward with enough credible evidence to support a reasonable finding in their favor after the allegations have been denied in sworn state-

ments entitle the defendants to summary judgment. *Westinghouse Elec. Corp. v. CX Processing Laboratories, Inc.*, 523 F.2d 668 (9th Cir. 1975).

Plaintiffs, nonetheless, strenuously urge that discovery has produced evidence sufficient to raise a genuine issue of material fact relative to the existence of a combination or conspiracy. The plaintiffs contend that questions as to the credibility of the defendants' witnesses raise issues of material fact. In addition, they contend that the statements contained in affidavits submitted on behalf of the plaintiffs and in opposition to the defendants' motions for summary judgment raise factual issues which must be left for jury determination. Finally, the plaintiffs contend that the actions of the defendants, viewed in their totality, raise a factual issue from which a jury might reasonably infer the existence of a conspiracy or combination. These contentions are without substantial support in the evidence and are without merit.

■ Summary judgment cannot be defeated "by the vague hope that something may turn up at trial." *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). Where, as here, the plaintiffs have failed to turn up substantial evidence in support of their conspiracy theory, and the defendants have introduced extensive and substantial evidence negating the theory, it is unreasonable to assume a trial would provide the plaintiffs with any greater opportunity to prove their theory, especially when the most that can be hoped for is to discredit the defendants' witnesses at trial. Under these circumstances, no question of fact is presented. Even if the denials by the defendants of the existence of any conspiracy are totally disregarded, the plaintiffs still had to come forward with evidence which, viewed in a light most favorable to them, would support the inference of a conspiracy. *Modern Home Inst., Inc. v. Hartford Accident and Indem. Co.*, 513 F.2d 102 (2d Cir. 1975). This they failed to do. Merely to assert that certain witnesses' or parties' affidavits or depositions are unclear, questionable, or evasive

as to the intent and state of mind of these parties, or merely to assert that under such circumstances summary judgment is an inappropriate method of determining issues which rely heavily upon credibility judgments does not shield the plaintiffs from summary judgment when they have failed to present credible evidence by way of affidavit or deposition or documentation to support their theory but have relied solely upon their own general and conclusionary statements. *Solomon v. Houston Corrugated Box Co., supra.*

■ Similarly, the Court may properly disregard affidavits submitted on plaintiffs' behalf which merely restate the allegations of the complaint and which are devoid of specific facts which support the allegations of the complaint. *Zenith Vinyl Fabrics Corp. v. Ford Motor Co.*, 357 F.Supp. 133 (E.D.Mich.1973). As the Court aptly observed in *Solomon v. Houston Corrugated Box Co., supra*, at 395:

"Appellant would have us hold that his own unsupported and conclusory pleadings, deposition testimony and affidavit, to the effect that an agreement or conspiracy existed, are sufficient to preclude summary judgment in this case. We do not hold that in a proper case and in all circumstances the statements of the antitrust plaintiff alone are not sufficient to defeat summary judgment. We do conclude that in the circumstances and posture of this case such statements are insufficient."

■ The plaintiffs' major argument, however, is that when the constituent parts are judged in their totality, the evidence is sufficient to raise a jury question as to the existence of a conspiracy. *Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242 (10th Cir. 1976). The constituent parts upon which plaintiffs rely are thin reeds indeed. While it is true that plaintiffs have cited numerous statements contained in the various depositions of the witnesses which, they claim, support their conspiracy theory, it is also true that those statements have been taken out of context. When those statements are placed in their proper context,

they simply do not admit to the strained interpretations which plaintiffs would put upon them. When the depositions are read in their entirety, the inferences of conspiracy, combination, or other unlawful activity which plaintiffs would see in them evaporate quickly.

The plaintiffs have insisted from the outset that these defendants have conspired or combined to restrain trade or to monopolize or attempt to monopolize the claim-staking and validation business. The plaintiffs contend that the situation here is analogous to, if not squarely in point with, the situation which existed in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). However, the fact situation in *Klor's* is clearly distinguishable from the present case. In the first place, it was clear in *Klor's* that Broadway-Hale, the plaintiff's competitor, was a large chain store which possessed significant market power. The evidence in this case is that, in addition to everything else it lacked, Polaris and its successor MS & M definitely lacked any kind of market power. Having been unable to handle its outstanding contracts with Kerr-McGee and Conoco, as the depositions show, it is inconceivable that MS & M or its predecessors were in any position to compel these giant energy companies to answer its beck and call. More importantly, there is absolutely no evidence that any kind of relationship existed, the net result of which was to stop the defendant energy companies from dealing with Natrona Service, Inc. To the contrary, the undisputed evidence is that both defendant energy companies continued to deal or attempted to deal with Natrona Service, Inc. right up until the time that Natrona Service, Inc. began systematically to overstake their claims. In addition, there is evidence that, at least as far as Conoco is concerned, Natrona Service, Inc. deliberately chose not to accept a request to assist Conoco or to submit a bid on a project. Most importantly, the defendants in *Klor's* did not deny the existence of the conspiracy or combination; instead, they relied upon the argument that the combination did not reduce the opportunities for customers to buy the products

which the manufacturers refused to sell to Klor's or which they sold only at discriminatory prices. Here, the defendants have specifically denied the existence of any combination or conspiracy to restrict their rights to purchase the services of Natrona Services, and the plaintiffs have failed to produce any credible evidence to the contrary.

■ Absent a purpose to create or maintain a monopoly or to restrain trade, it simply is not a violation of the Sherman Act for one engaged in an entirely private enterprise, freely to exercise his own independent discretion as to parties with whom he will deal. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Shawver & Son, Inc. v. Okla. Gas & Elec. Co.*, 463 F.2d 204 (10th Cir. 1972); *Modern Home Inst., Inc. v. Hartford Accident and Indem. Co., supra; Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17 (9th Cir. 1971). Even if there were a conspiracy between Conoco and Kerr-McGee to substitute MS & M and its predecessors for Natrona Service, Inc., (and there is no evidence that there was), such a conspiracy without an unlawful intent to exclude Natrona Service, Inc. from engaging in the location and validation business is not a violation of Sections 1 or 2 of the Sherman Act. *Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969); *Craig v. Sun Oil Co. of Pa.*, 515 F.2d 221 (10th Cir. 1975). Evidence of an anti-competitive motive, of price fixing, of other similar motives or demands, or of the imposition of anti-competitive practices upon MS & M and its predecessors by Conoco and Kerr-McGee or upon them by MS & M must be shown, and it wasn't. *Seagram v. Hawaiian Oke and Liquors, Ltd., supra.*

■ The plaintiffs consistently argued that the defendants' motives were to fix prices at unreasonably low levels and to deliberately avoid the mining law requirements. However, there was no evidence to support these assumptions. On the contrary, the evidence is that Wickware did underbid these projects, that he did so because he lacked experience, that there was

no agreement to maintain prices at artificially low levels because, upon assuming the contracts, MS&M immediately proceeded to negotiate an increase in the prices for completion of the work. That was hardly an action consistent with a conspiracy or combination. The evidence shows that both Conoco and Kerr-McGee were unhappy with the rate of performance of Polaris to the extent that Johnson of Conoco had even informed Wickware that Polaris would not be permitted to complete the contract.

The recent Tenth Circuit decision in *Pacific Engineering Production Company of Nevada v. Kerr-McGee Corporation and Kerr-McGee Chemical Corporation,* 551 F.2d 790 (10th Cir. 1977) is instructive. In that case, Pacific Engineering and Kerr-McGee's predecessor American Potash were virtually the exclusive manufacturers of ammonium perchlorate. For a number of reasons, the market for that chemical had declined over a period of years as had the sales price. When the price dropped so low that it threatened the existence of Pacific Engineering, that company brought a Section 2 Sherman Anti-trust suit alleging "predatory pricing" by American Potash. There was actually some evidence that American Potash knew of Pacific Engineering's trouble, but still maintained the low sales price schedule. The Court, nevertheless refused to find an anti-trust violation stating:

> "Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise . . . In a two-firm industry, the exclusion of one firm necessarily results in a monopoly. That does not mean the survivor necessarily violates the antitrust laws." *Pacific Engineering v. Kerr-McGee, supra* at 795.

The Tenth Circuit concluded that where (as in this case) there is no other evidence of anti-competitive conduct, illegal predatory price cutting is probably not reached until the sales price falls below the costs incurred by the sale. The sale of goods above the cost of production is rational competitive behavior. The Court implied that even when costs exceeded sales, predatory pricing would not be found when the intent of the seller and long-run production variables indicated otherwise. *Pacific Engineering v. Kerr-McGee, supra,* at 796–797.

It has already been noted that, MS&M immediately pressed for price increases as had Natrona Service, Inc. in the past. This was obviously an action to make the operation more viable, an action totally incompatible with the predatory pricing concept.

█ The plaintiffs also have assumed that there is evidence of a combination or conspiracy because both Conoco and Kerr-McGee ceased using Natrona Service, Inc.'s services at approximately the same time. Is this a conspiracy, when both did so in response to the plaintiffs' price increase, or is it only a fairly normal business reaction? The plaintiffs failed to establish through discovery the existence of any relationship between the manner in which Conoco and Kerr-McGee selected plaintiffs' competitor and their or the competitor's ability to control prices or competition. They have simply failed to establish an anti-trust violation based upon monopoly. *Mogul v. General Motors,* 391 F.Supp. 1305 (E.D.Pa.1975), aff'd, 527 F.2d 645 (3rd Cir. 1976). Even if such actions were consciously parallel, there must be evidence of "circumstances which logically suggest joint agreement, as distinguishable from individual action" before a conspiracy can be inferred. *Seagram v. Hawaiian Oke and Liquors, Ltd., supra,* at 85.

The evidence is undisputed that the decisions to employ Natrona Service, Inc.'s competitor were made approximately two months apart, and that they were made for similar and yet different reasons. The plaintiff MacGuire himself admits that there was pressure from within the respective companies to keep costs down. The evidence is undisputed that the plaintiffs' prices increased dramatically and frequently over a very short period of time. The evidence is undisputed that both companies were upset with Natrona Service, Inc.'s willingness to overstake claims on behalf of their competitors which Natrona Service,

Inc. itself had staked earlier for either Conoco or Kerr-McGee. It is undisputed that many of these problems existed simply because Natrona Service, Inc. itself had a virtual monopoly on the validation business in Wyoming and had been able to act almost with impunity in its dealings with these defendants and others who required Natrona Service, Inc.'s services.

Plaintiffs are wrong to suggest that it may be inferred that some sinister, anti-competitive motive existed for Conoco's and Kerr-McGee's change in their claim-service company in the light of the fact that Natrona Service, Inc. was a well-established, highly regarded company in the business and Wickware and his successors were neophytes. At most, such evidence, in light of Johnson's and Sandlin's dissatisfaction with their personal relationship with MacGuire and their business relationship with Natrona Service, Inc., permits the inference that these defendants made an error in judgment in selecting and retaining Natrona Service, Inc.'s competitor. But, it is not a violation of the Sherman Act to make an error in business judgment. *Seagram v. Hawaiian Oke and Liquors, Ltd., supra.*

■ There is no evidence in the record which will permit the inference plaintiffs urge, namely, that the defendants' purpose in changing locators was to eliminate or damage plaintiffs or to force them to acquiesce to unlawful demands. One may discontinue a relationship for business reasons which are sufficient unto himself, and the adverse effect on the business of the one with whom he ceases to deal is immaterial in the absence of any arrangement restraining competition or trade. *Ricchetti v. Meister Brau, Inc.,* 431 F.2d 1211, *cert. denied,* 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971); *Modern Home Inst., Inc. v. Hartford Accident and Indem. Co., supra; Solomon v. Houston Corrugated Box Co., supra.*

■ In contrast, the evidence is that the decision to stop doing business with Natrona Service, Inc. and to look elsewhere for a competitor was made at the local level by Johnson for Conoco and by Sandlin for Kerr-McGee. The plaintiff has failed to present one iota of evidence which establishes or which would permit the inference that this decision was made by upper management. When the action taken is based upon such local management decisions and there is no evidence to show that such decisions were directed by higher corporate officials, there is no dispute as to any genuine issue of fact and there is no violation of the Sherman Act. *Solomon v. Houston Corrugated Box Co., supra.* Moreover, it has been amply demonstrated, and MacGuire does not deny, that both Johnson and Sandlin believed that they were being treated unfairly when Natrona Service, Inc. overstaked claims it had originally staked for them. Although MacGuire saw nothing wrong with this because he was simply doing what his employer at that time was directing him to do, Sandlin, and particularly, Johnson, saw a great deal wrong with such actions. One may cease to do business with another because he thinks such person is acting unfairly. *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

■ The plaintiffs also argue that there is evidence of a conspiracy or combination because the defendants did not come to Natrona Service, Inc. even though it was ready and able to perform and because the defendants knew that Wickware and afterwards MS&M were not performing the work according to MacGuire's standards. Conoco and Kerr-McGee did decide to stay with Wickware and MS&M despite what MacGuire told them about the insufficiency of the work. However, sound business reasons were put forth for doing so. In the first place, both were performing the work for a sum less than MacGuire was initially willing to do it. Secondly, once they had entered into a contract, Conoco and Kerr-McGee expected that contract to be fulfilled. Johnson said that he did not believe it was a good policy to switch contractors once into a project. Plaintiffs' assertion that this was bad judgment notwithstanding, the defendants' decision to stick with Natrona Service, Inc.'s competitor simply is

not a violation of the Sherman Act. *Solomon v. Houston Corrugated Box Co., supra.*

The plaintiffs also imply that a conspiracy or combination may be found in the defendants' failure to investigate this new entry into the location and validation business. However, when Johnson of Conoco did make inquiry into the work being performed by Wickware, the plaintiffs claim that such contact is evidence of a conspiracy. The plaintiffs cannot have it both ways. The inquiry by Johnson was reasonable and the response by Sandlin and Bale was proper. A summary judgment cannot be denied on that basis.

 The plaintiffs also contend that there is evidence of a conspiracy or combination because the defendants did not call for bids or permit Natrona Service, Inc. to bid on any of the projects. In the first place, that statement is not accurate. The record is clear that Johnson asked MacGuire if he would be interested in submitting a bid for a project in the Rock Springs area after the alleged acts constituting the imagined conspiracy had occurred. MacGuire refused to bid the job when he learned the competitor was Wickware. In the second place, the Sherman Act is not a "lowest responsible bidder statute nor a panacea for all business affronts which seem to fit no where else." *Scranton Const. Co. v. Litton Indus. Leasing Corp., supra,* at 783.

Finally, it cannot be overlooked that the situation presented in this action is unique for several reasons. First, the plaintiff is in the unusual position of complaining, in essence, that the presence of a competitor has damaged his "exclusive" business. Actually, what this means is that prior to the appearance of Wickware and his successors, Natrona Service, Inc. had no competition. It was the only company which was able to perform all the tasks required to take a mining claim from its initial layout to its validation under appropriate mining laws. Second, the plaintiffs complain that the defendants' refusal to buy their services and under these circumstances, the plaintiffs have the burden of demonstrating that their product has some value above the

price paid or offered. A refusal to buy a product for more than what one thinks it is worth is not a violation of the anti-trust laws. *Am. Tel. & Tel. Co. v. Delta Communications Corp.,* 408 F.Supp. 1075 (S.D.Miss. 1976).

 In view of the Court's conclusion that there is no substantial evidence to raise a genuine issue of fact as to a violation of Section 1 of the Sherman Act, it is also proper to grant summary judgment as to the claim based upon Section 2 of the Act. "Mere refusal to deal, without agreement or conspiracy, simply is not *per se* a violation of the antitrust laws." *Solomon v. Houston Corrugated Box Co., supra,* at 397. This is particularly true where the alleged conspiracy is a refusal to buy, since there is a question whether a refusal to buy is ever a per se violation or is inherently limited to refusal-to-sell situations. *Am. Tel. & Tel. Co. v. Delta Communications Corp., supra.*

For the same reasons, and without deciding whether the plaintiffs may assert a claim for damages under the common law for anti-competitive activity, the plaintiffs' third claim for relief is without merit and is properly subject to summary judgment. The plaintiffs having failed to establish the existence of a genuine issue as to a material fact, the defendants are entitled to summary judgments as to all claims for relief common to them, being the first and third causes of action of the Amended Complaint. An order in accordance with this opinion shall be entered, and that this opinion shall constitute the Court's Findings of Fact and Conclusions of Law.

With respect to the first and second causes of action against Kerr-McGee, the plaintiff alleges in the first separate cause of action against Kerr-McGee that it was engaged to perform a rush claim-staking validation project in Utah of approximately 3,000 claims for approximately $60.00 per claim, that the plaintiff in reliance upon this agreement assembled crews, transported them to Utah and commenced operations. It is further alleged that Kerr-McGee cancelled the contract prior to completion of the work by plaintiff, and that as

a result of this cancellation plaintiff lost anticipated profits in the amount of $90,-000.00. In the second separate cause of action against Kerr-McGee, plaintiff alleges that it was contacted by Kerr-McGee to stake mining claims in Wyoming, that the plaintiff was to commence work as soon as possible, and that the number of claims to be staked was approximately 2,000. Again, it was alleged that plaintiff mobilized its crews and equipment to perform the contract and that Kerr-McGee cancelled the contract without completion. In this particular cause of action plaintiff alleges that Kerr-McGee purchased false and fraudulent mining claims from third parties rather than permitting plaintiff to stake these claims on behalf of Kerr-McGee. It is alleged that the plaintiff's loss of anticipated profits was $65,000.00.

The undisputed facts in the record show a regular pattern of conduct with respect to the claim-staking contracts between Natrona Service, Inc. and Kerr-McGee. Initially, the Kerr-McGee geologist would indicate an area of interest where claims were to be staked. The geologist would advise Larry Bale, the Kerr-McGee landman in Casper, of the area and he would then make a record check to determine what claims were already staked in the area. Maps were prepared showing the portions of the area which were believed to be open for claim-staking. The land department would then contact Ken Sandlin who would line up a claim-staking contractor. Sandlin would indicate to the contractor the approximate area to be staked and the approximate number of claims. These claims were initially to be located only with discovery monuments unless and until the geology department of Kerr-McGee instructed Sandlin to have the claims completed by placing stakes and drilling validation holes. The number of claims involved was always subject to change, either by increase or by decrease and it was common for the number of claims to be reduced before being staked to completion (Sandlin Deposition, 51–56. 265–269; Bale Deposition, 8–13).

Kerr-McGee had a regular form of surveying contract for staking mineral claims. Customarily, paragraph 2(c) of the contract provided that the contractor would be paid so much per discovery, so much per claim completion, and so much per claim validation. Paragraph 4 of the contract provided that the contractor agreed to locate discovery markers only until advised by Kerr-McGee to proceed to completion and validation (Exh. A, Kerr-McGee Brief; MacGuire 236).

On some jobs performed by the plaintiff there were written surveying contracts, and on some jobs the agreement was oral (Kerr-McGee Supp. A/I Part B, 33). It is clear from the record that the oral agreements always followed the pattern of the written agreements. Kerr-McGee could instruct the contractor to stop at any point after locating discovery monuments. This appears to have been a clear and understood course of action (MacGuire, 190; Sandlin, 268). Whether or not Kerr-McGee would complete the claims and validate them depended on the geology department. The geologist would advise Sandlin if they had no further interest in the area and therefore completion was not to be accomplished or, on the other hand, if the area was of interest and completion was to be accomplished. Sandlin would then so advise the contractor (Sandlin, 64–67, 265–269).

The first separate cause of action against Kerr-McGee involves a project in Emery County, Utah referred to as the Cedar Mountain project. In early May 1973 Sandlin called MacGuire and advised that he had a rush project in Utah. He asked MacGuire if MacGuire could handle the project and MacGuire replied affirmatively. According to Sandlin, the indicated number of claims was 1,500, but according to MacGuire it was 3,000 (Sandlin, 268). MacGuire testified that he mobilized eight crews and quickly dispatched them to Utah for the project. It is agreed that there was no written contract on this project and that the arrangements between the parties were oral (Kerr-McGee Supp. A/I Part B, 33). After MacGuire's crews had placed discovery monuments on certain claims, Sandlin advised MacGuire to stop and not place any

stakes or drill any validation holes (Sandlin, 268, Exh. 24). Exhibit 24 in the Sandlin deposition is a letter from MacGuire to Sandlin dated May 29, 1973 which sets forth the plaintiff's charges to Kerr-McGee for services in connection with the Cedar Mountain project in Emery County, Utah. This document shows that discovery monuments were placed on a total of 1,193 claims. MacGuire billed Sandlin at the rate of $20 per each claim, or $23,860.00. Also billed was a charge of $2,250.50 for 3,215 posts left over at the rate of $0.70 each. This statement was paid by Kerr-McGee as presented. Sandlin testified that Kerr-McGee paid for the left-over posts because MacGuire had been requested to have the posts available for the project and MacGuire could not use the posts in Wyoming (Sandlin, 218). The parties are not in agreement as to the significance of the number of posts. Kerr-McGee asserts that the number of posts would indicate that 1,500 claims were contemplated because the posts were used both for discovery monuments and staking corner boundaries in accordance with Utah requirements (Sandlin, 315). The plaintiff asserts that these posts were for discovery monuments and therefore it was contemplated there would be at least 3,000 claims.

█ There is no evidence that either MacGuire or the plaintiff ever presented a further or additional statement for services to Kerr-McGee in connection with the Cedar Mountain project. Therefore the Court finds that Kerr-McGee paid the exact amount to the plaintiff which the plaintiff billed and that such payment constitutes full satisfaction in connection with plaintiff's performance of services on the Cedar Mountain project.

The second separate cause of action against Kerr-McGee relates to the Grieve project in the Burnt Wagon Draw area of Wyoming. Kerr-McGee and Natrona entered into a written surveying contract in connection with this project dated May 14, 1973 attached to Kerr-McGee's brief as Exhibit A and identified by MacGuire in his deposition at page 236. Bale of Kerr-McGee submitted to MacGuire a map showing in red outline the area in the Grieve project to be staked. This is identified in MacGuire's deposition as Exhibit O at page 238. A few of the claims within the red area on Exhibit O were dropped by Kerr-McGee and not staked by Natrona Service, Inc. The parties had a minor disagreement over the number of claims which were located as reflected in Exhibits P and Q in MacGuire's deposition, page 236. MacGuire billed Kerr-McGee for locating discovery monuments on 534 claims. Sandlin wrote to MacGuire on July 12, 1973, Exhibit P, stating that he could only account for a total of 493 claims. MacGuire replied on July 16, 1973 to Sandlin (Exhibit Q, MacGuire Dep.) that he agreed with the reduction in number of claims except with respect to the BW group which MacGuire reflected as 118 and Sandlin had reflected as 107 claims. With this adjustment in the number of claims, MacGuire's invoice was paid by Kerr-McGee as corrected. There was no further discussion or dispute concerning the Grieve project until the filing of the original complaint in this action. Therefore it is clear that the parties agreed that plaintiff had been paid in full for its services in connection with the Grieve project.

█ MacGuire contended that Natrona Service, Inc. should have been permitted to stake claims in connection with the Grieve project in an area adjacent to the area marked in red on the map, Exhibit O. These adjacent claims had been staked by U.S. Energy Corporation and Kerr-McGee had made an agreement with this corporation to purchase these claims. MacGuire told Bale that the U.S. Energy claims were invalid and requested Bale to permit him to stake them on behalf of Kerr-McGee. Initially, Bale agreed to permit MacGuire to overstake these claims, but then after discussion with Bale's supervisor, Dale Trubey, it was decided that Kerr-McGee would require U.S. Energy Corporation to perfect the claims rather than overstaking them and MacGuire was so advised (Bale, 64–84). The discussions between Bale and MacGuire

were only discussions and negotiations and did not give rise to any contractual obligation on the part of Kerr-McGee to employ MacGuire to stake these claims. The Court finds with respect to the second separate cause of action that Kerr-McGee fulfilled all obligations required of it under the Grieve project contract and that there was no other, further or different agreement which Kerr-McGee did not fulfill.

██ The Court concludes as a matter of law that there is no genuine issue as to any material fact regarding the first and second separate causes of action against Kerr-McGee. The parties entered into claim-staking agreements which were subject to change by Kerr-McGee. The number of claims to be staked in each cause of action was subject to change by Kerr-McGee and Kerr-McGee had the legal right to make such change.

The discussions between the parties as to the approximate number of claims which might be involved did not constitute an agreement that such number would actually be staked. *Crockett v. Lowther,* 549 P.2d 303, 311 (Wyo.1976); 1 Williston, Contracts (3rd Ed.), Section 22; Restatement of Contracts, Section 20. Nor did plaintiff's mere hopes and expectations give rise to a binding agreement enforceable as a matter of law. Corbin, Contracts, Sections 22, 23; 1 Williston, Contracts, Section 27; Restatement of Contracts, Section 25; 17 Am. Jur.2d, Contracts, Sections 24, 25.

The plaintiff submitted invoices to Kerr-McGee in connection with each project and Kerr-McGee paid the invoices submitted by the plaintiff. It was not asserted by plaintiff that there was any additional or separate dispute between the parties regarding these agreements or that payment by Kerr-McGee of plaintiff's invoices was part payment only. Therefore, plaintiff waived any further claim by not asserting it at the time the invoices were submitted and paid.

In connection with the Grieve project, the Court concludes that the discussions between Bale of Kerr-McGee and MacGuire did not constitute a valid binding obligation on the part of Kerr-McGee to hire the plaintiff to stake adjacent claims. These were merely discussions between the parties but did not give rise to a binding agreement.

In accordance with these findings of fact and conclusions of law, the motion for summary judgment of Kerr-McGee with respect to the first and second separate causes of action against Kerr-McGee in the amended complaint shall be granted.

██ In the third and fourth separate causes of action against Kerr-McGee in the amended complaint, plaintiff seeks relief with respect to so-called Exhibit "B" mining claims. These are mining claims which Kerr-McGee has staked but which plaintiff has not staked and to which plaintiff asserts no right, title or interest. Plaintiff prays that these claims be declared open on the basis that they were invalidly staked by Kerr-McGee.

Kerr-McGee has moved for summary judgment on the third and fourth separate causes of action with respect to the Exhibit "B" claims on the ground that plaintiff has no standing to attack Kerr-McGee's rights with respect to these claims and that there is no justiciable issue for the Court to determine relying on *Kanab Uranium Corporation v. Consolidated Uranium Mines, Inc.,* 227 F.2d 434 (10th Cir. 1955) and other cases.

At the hearing on motions for summary judgment on October 18 and 19, 1976 counsel for plaintiff conceded that there is no justiciable controversy as to the Exhibit "B" claims and stated that the complaint should be amended so that the Exhibit "B" claims are deleted (Transcript of Motion for Summary Judgment and Pending Matters, October 19, 1976, p. 346). The Court finds and concludes that there is no justiciable controversy with respect to the Exhibit "B" claims and that the plaintiff has no standing to challenge these mining claims. It is therefore the ruling of the Court that the motion for summary judgment of Kerr-McGee be granted on the third and forth separate causes of action with respect to the Exhibit "B" claims, and that this opinion shall constitute the Court's findings of fact and conclusions of law thereon.

The plaintiff's second cause of action against all defendants alleged a claim for violation of Article 10, Section 8 of the Wyoming Constitution and Section 40–18 Wyoming Statutes, 1957 as amended. The Court, at the time of the argument upon said motion for said summary judgment granted the defendants' motions for summary judgment as to the second cause of action of the plaintiffs' amended complaint, without opposition of the plaintiffs.

Accordingly, it is hereby

ORDERED that defendants' motions for summary judgment are granted as to the first, second and third causes of action of the plaintiffs' amended complaint; that the motions for summary judgment of Kerr-McGee Corporation as to the first, and second separate causes of action against Kerr-McGee and as to the third and fourth separate causes of action with respect to the Exhibit "B" claims in the amended complaint are granted. The plaintiffs' causes of action against Phillips Petroleum Company have heretofore been dismissed. Judgment is entered in favor of the defendants and against the plaintiffs, each party to pay its or their own costs.