**NATRONA SERVICE, INC.,**
**Plaintiff-Appellant,**

v.

**CONTINENTAL OIL CO., Kerr-McGee**
**Corporation, and Meurer, Serafini &**
**Meurer, Inc., Defendants-Appellees.**

**No. 77–1845.**

United States Court of Appeals,
Tenth Circuit.

Submitted March 13, 1979.

Decided May 4, 1979.

---

22.  *Id.*

Herbert B. Newberg, Philadelphia, Pa. (Dennis M. Hand of Hand, Hand & Hand, Casper, Wyo., on brief), for plaintiff-appellant.

Houston G. Williams of Wehrli & Williams, Casper, Wyo. (Barry G. Williams of Wehrli & Williams, Casper, Wyo., and Bruce R. Merrill, Senior Counsel, Continental Oil Company, Houston, Tex., on brief), for defendant-appellee Continental.

Richard L. Schrepferman of Holme, Roberts & Owen, Denver, Colo. (Peter H. Holme, Jr., and Stephen E. Snyder of Holme, Roberts & Owen, Denver, Colo., Clydine Cornett, Kerr-McGee Corp., Oklahoma City, Okl., William T. Schwartz, Casper, Wyo., on brief), for defendant-appellee Kerr-McGee.

Richard L. Harring of Calkins, Kramer, Grimshaw & Harring, Denver, Colo., for defendant-appellee Meurer, Serafini & Meurer, Inc.

Before McWILLIAMS and BARRETT, Circuit Judges, and MILLER,* Judge, United States Court of Customs and Patent Appeals.

BARRETT, Circuit Judge.

Natrona Services, Inc. (Natrona) seeks review of an order granting summary judgment to Continental Oil Co. (Continental), Kerr-McGee Corporation (Kerr-McGee) and Meurer, Serafina & Meurer (MSM), defendants below.[1]

Natrona filed this anti-trust suit alleging violations of Sections 1 and 2 of the Sherman Act and Wyoming common law of unfair competition and restraint of trade. Natrona specifically alleged that appellees unlawfully combined or conspired to exclude it from engaging in the business of performing uranium claim taking and validation services, and with monopolizing and attempting to monopolize scarce uranium claim areas in Wyoming and elsewhere without complying with the claim location and validation requirements. Predicated thereon, Natrona alleges that "the natural effects of which are to exclude plaintiff from engaging in its business and to restrain plaintiff's interstate trade and commerce." A detailed recitation of the allegations, circumstances and facts is set forth in the Memorandum Opinion and Order of the District Court. *See: Natrona Service, Inc. v. Continental Oil Company, et al.,* 435 F.Supp. 99 (D.Wyo.1977).

Natrona is a Wyoming corporation formed in 1967. It was, during the relevant

---

* Washington, D. C., sitting by designation.

1. Defendants below will hereinafter be collectively referred to as "appellees."

time periods herein, engaged in the business of providing custom uranium claim location and validation services in the western United States for energy companies as an integral part of their uranium exploration and development programs.

Kerr-McGee and Continental are energy related companies which explore for, develop, and sell energy in various forms, including uranium. MSM is a Colorado engineering firm which was engaged in the claim staking and validation business in late 1974 and 1975. MSM acquired the contracts of Polaris Company, a joint venture of Ken Wickware and Ronald Harris. Prior to the formation of Polaris, Wickware had operated individually in the claim staking business under the trade name of Conrad.

Prior to 1974 Natrona had little, if any, competition in Wyoming in the claim staking and validation business. It had performed virtually all of Kerr-McGee's and Continental's claim staking and validation work in Wyoming. It is uncontested that Natrona generally performed its services well.

In the spring of 1974, Natrona announced that it would have to increase its prices for services in order to meet increased overhead, to overcome past losses, and to operate profitably. Natrona's price increase from $40 to $50 per claim was accepted as reasonable. However, a subsequent announced future rate of $60 per claim was considered too high by Kerr-McGee and Continental. During the period of the price increases, personality conflicts developed between John MacGuire, president of Natrona, and personnel of Kerr-McGee and Continental. Allegations and counter allegations of conflicts of interest, overstaking and unethical conduct ensued. Pressure developed at the same time from the "home" offices of Kerr-McGee and Continental to keep costs down relating to claim staking activities.

Prior to this time Wickware, who owned a surveying business, decided to go into the claim staking business under the name of Conrad. In April 1974, Conrad was awarded a contract by Kerr-McGee. Conrad proved unable to perform its work effectively. Wickware thereafter joined with Harris in a joint venture, Polaris, to complete the Kerr-McGee work. In June 1974, Continental contracted with Polaris for claim staking work. Polaris, just as its predecessor, performed ineffectively. In November, 1974, without knowledge of Kerr-McGee or Continental, MSM acquired the assets and contracts of Polaris. When Kerr-McGee and Continental were informed that MSM had acquired Polaris, both insisted that MSM complete the contracts thus assumed.

In May, 1975, Natrona began systematically overstaking certain claims of Kerr-McGee and Continental which had been contracted to Polaris or MSM. This was undertaken, according to Natrona, only after it was unable to convince Kerr-McGee and Continental that the work being performed by MSM was invalid and "should be turned over to plaintiff [Natrona] who was able to properly validate them." Natrona contends that activities of appellees at this time were designed to drive Natrona out of business and to circumvent the applicable mining statutes.

Natrona filed its original complaint August 7, 1975. An amended complaint was filed in November, 1975 against Continental, Kerr-McGee, Phillips Petroleum Company, MSM and various John Does. The amended complaint set forth three causes of action against all the defendants, four separate causes of action against Kerr-McGee, and two separate causes of action against Phillips.

Following extensive discovery, a hearing was set for October 18, 1976 on appellees' motions for summary judgment. Pursuant to a stipulation, all claims against Phillips Petroleum Company were dismissed with prejudice. At the hearing, Natrona also confessed that its second claim for relief

against appellees did not state a claim upon which relief could be granted. Natrona further conceded that there was no justiciable controversy as to certain Exhibit "B" claims and that the complaint should be amended to delete them. (The Exhibit "B" claims were the "Third" and "Fourth" causes of action against Kerr-McGee.)

The trial court's opinion recognized, in detail, the limited utilization of summary judgment in antitrust litigation. However, the court cited numerous opinions delineating the essential elements of an antitrust action and the manner in which they must be established. In its detailed and comprehensive Memorandum Opinion and Order the District Court found that: appellees had not conspired, combined or contracted to fix prices in the claim staking and validation business or to boycott Natrona; appellees had not monopolized or attempted to monopolize the claim staking and validation business in violation of Sections 1 and 2 of the Sherman Act; Natrona's third claim for damages was without merit; Kerr-McGee and Continental ceased doing business with Natrona and sought the services of another locator for sound business reasons, i. e., both believed that Natrona had raised its prices too high and that Natrona was treating them unfairly by overstaking claims it had originally staked for them; and that Kerr-McGee was not liable to Natrona in damages for allegedly cancelling several contracts, inasmuch as Kerr-McGee had paid the invoices Natrona had submitted to it and Natrona had failed to assert further payment was due and owing.

On appeal Natrona contends that: (1) the amended complaint sets forth activities by appellees which, if proved at trial, would constitute violations of Sections 1 and 2 of the Sherman Act; (2) at trial it will introduce evidence that establishes appellees' violation of the Sherman Act and the common law of Wyoming regulating unfair competition and anti-competitive conspiracies; and, (3) summary judgment was im-properly and prematurely granted by the trial court.

### I.

Natrona contends that the amended complaint sets forth activities of appellees which, if proved at trial, would constitute violations of Sections 1 and 2 of the Sherman Act. (As noted, *supra*, at the motion hearing, Natrona conceded that all the actions against Phillips, one action against all the appellees, and two separate causes of action against Kerr-McGee failed to state claims upon which relief could be granted.)

In presenting this argument, Natrona has set forth seven sub-contentions delineating activities which may give rise to anti-trust violations. Significantly, however, Natrona has not presented any evidence in the record which establishes that appellees engaged in activities giving rise to anti-trust violations. Rather, Natrona has undertaken, both within its brief and during oral argument, to "educate" this court, so to speak, relative to claim staking procedures, general anti-trust law and other such fundamental matters. Suffice to say, none have assisted Natrona's cause in convincing this Court that the District Court erred in granting summary judgment.

We are thus confronted, just as was the trial court, with numerous allegations of anti-trust violations unsupported by cogent evidence in the record. In our view, Natrona has opted not to address the real issue on appeal, i. e., whether the entire record contains sufficient evidence to establish a *prima facie* case against appellees. We hold that it does not. Under such circumstances the trial court did not err in granting summary judgment.

It seems that it can be fairly argued that Natrona seeks damages for profits it would likely have made if it had not lost its "monopoly" on the claim staking and validation business in Wyoming. Anti-trust laws have been enacted for the protection

and preservation of competition, not for the protection of competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) citing to *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

■ In the absence of any significant supporting evidence, Natrona's allegations which may otherwise be construed as stating a valid cause of action, were properly dismissed. In *First National Bank v. Cities Service*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court observed:

> Essentially all that the lower courts held in this case was that Rule 56(e) placed upon Waldron the burden of producing evidence of the conspiracy he alleged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegation were not susceptible of the interpretation which he sought to give them. That holding was correct. To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. *While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an anti-trust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.* (Emphasis supplied.) 391 U.S. at pp. 289–290, 88 S.Ct. at p. 1593.

## II.

Other general allegations of Natrona merit some comment.

### (a)

Natrona has consistently alleged that appellees may not assert the exercise of reasonable business judgment as a pretextual defense for their alleged anti-competitive activities. Natrona specifically asserts that statements of Kerr-McGee and Continental that they utilized the services of MSM and its predecessors because they were able to acquire their services at prices less than those charged by Natrona was a pretext for their anti-competitive activities.

Natrona argues that it had to raise its prices in order to remain profitable. The record indicates otherwise. Within its amended complaint (specifically the first and second causes of action alleged against Kerr-McGee) Natrona's pleadings establish that it anticipated a 50% profit margin on all claims performed at $60 and $65 per claim, and that it anticipated a profit of $155,000 on two jobs for Kerr-McGee covering a total of 5,000 claims. Under these circumstances, it is apparent that Wickware or any other like industry observer could readily ascertain the possibility of undertaking the same work at a substantially lesser charge and yet anticipate the prospect of realizing a considerable profit.

### (b)

■ Natrona has repeatedly alleged that the actions of appellees allowed them to acquire an unlawful monopoly to the right to explore uranium claim areas. The record does not support this claim. This court recently affirmed Natrona's right to exclusive possession of certain mining claims it had overstaked against Continental. *Continental Oil Company v. Natrona Service, Inc.*, 588 F.2d 792 (10th Cir. 1978). If, as Natrona alleges, appellees had actually acquired a monopoly to the exclusive right to explore uranium claim areas, Natrona would not have been able to enter into and upon the property and proceed to overstake Continental's claims.

### (c)

■ Without indicating what additional discovery was necessary, Natrona has

nevertheless alleged on occasions that it was not provided adequate time within which to complete its discovery and prepare for trial. This contention is without merit.

Counsel for Natrona was afforded the time requested as evidenced by the following colloquy:

MR. JERRY HAND: Before we move off this topic, for the record, I would like to object to the rush that the Plaintiff is being put under. I think it is not fair we are not being accorded an opportunity to present our case.

THE COURT: A rush?

Mr. Hand, I just told you that you could have as much time as you wanted and asked you how much you wanted and I asked you if ninety days was reasonable and I received no response to the contrary.

MR. JERRY HAND: I didn't understand you were asking me. I understand you said you thought ninety days was reasonable.

I don't want to disagree with your thoughts, but I don't see how when preparing this other case we have an adequate time.

THE COURT: Once again, I am going to ask you the same question I asked you before. If you don't think that is reasonable, what do you think is reasonable?

MR. JERRY HAND: I would think 120 days.

THE COURT: Very well. You will have 120 days. Then the Motions for Summary Judgment are set October 18 with the requirement that Motions for Summary Judgment be filed by September 20.

[Jt. Appendix, Vol. I, at pp. 119a–120a.]

After the motion hearings, the parties were allowed an additional thirty days to complete further discovery for the court's consideration. Under these circumstances, we cannot hold that Natrona was afforded inadequate time for discovery.

### III.

We have carefully considered Natrona's remaining allegations of error. We hold that they are individually and collectively without merit. Each was thoroughly and properly considered and decided by the trial court.

WE AFFIRM.