CONSOLIDATED FARMERS MUTUAL INSURANCE COMPANY et al., Plaintiffs,

v.

ANCHOR SAVINGS ASSOCIATION et al., Defendants.

No. 78–4094.

United States District Court,
D. Kansas.

Nov. 7, 1979.

L. M. Cornish, Jr., Glenn, Cornish, Leuenberger, Chartered, Topeka, Kan., Sheridan Morgan, Donald H. Loudon, Morris, Larson, King, Stamper & Bold, Kansas City, Mo., for plaintiffs Consolidated Farmers Mutual Insurance Co. and Kansas Mutual Insurance Co.

James R. Loftis, III, James W. Olson, Bergson, Borkland, Margolis & Adler, Washington, D. C., Leonard O. Thomas, Weeks, Thomas, Lysaught, Bingham & Mustain, Kansas City, Kan., Robert L. Hamann, Prairie Village, Kan., for defendant Anchor Savings Association.

James D. Waugh, Cosgrove, Webb & Oman, Topeka, Kan., John P. Arness, Jack McKay, David B. Waller, Hogan & Hartson, Washington, D. C., for defendant Federal National Mortgage Association.

Herbert H. Hopper, Wichita, Kan., for defendant Fidelity Investment Co.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

### INTRODUCTION

This is an antitrust action brought pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and under unspecified sections of the Kansas antitrust laws contained in K.S.A. 50–101 et seq.

Plaintiffs Consolidated Farmers Mutual Insurance Company and Kansas Mutual Insurance Company are two Kansas insurance companies which as part of their businesses sell real property hazard insurance.

Defendant Anchor Savings Association is a Kansas savings and loan association. Defendant Fidelity Investment Company is a Kansas mortgage banker. Defendant Federal National Mortgage Association (FNMA) is a federally chartered, privately owned[1] corporation which was created "to provide supplementary assistance to the secondary market for home mortgages by providing a degree of liquidity for mortgage investments." 12 U.S.C. § 1716(a). When the case began, a fourth defendant was the Federal Home Loan Mortgage Corporation (FHLMC), a quasi-public corporation authorized by Congress in 12 U.S.C. § 1451 et seq. to aid the secondary market. By order of September 8, 1978, this Court

---

1. Both plaintiffs' complaint and this Court's order of September 8, 1978, mistakenly refer to FNMA as a "quasi-public" corporation. Prior to 1968, the federal government did own the preferred stock of FNMA. However, the Housing and Urban Development Act of 1968, 12 U.S.C. §§ 1716b, 1717(a)(2), partitioned FNMA into the Government National Mortgage Association (GNMA), under the jurisdiction of the Department of Housing and Urban Development, and FNMA became a wholly private corporation serving a public purpose.

dismissed FHLMC from the action on grounds of statutory immunity.[2]

A brief background is necessary to an understanding of the nature of the action. When a home is purchased the prospective homeowner frequently obtains a mortgage loan from a savings and loan institution or a bank. This is the "primary" mortgage market. Defendants Fidelity and Anchor are in the business of originating mortgages in the primary market. In order to gain funds to make additional loans, Fidelity and Anchor sell these mortgages to institutional investors and entities such as FHLMC and FNMA. When the originator of a mortgage attempts to transfer it, the "secondary" mortgage market is involved. In the secondary market, FNMA and FHLMC facilitate the transfer of mortgages from originators to institutional investors, in part by establishing some uniformity in the mortgage transaction so that the institutional investor will have a better idea of what it is purchasing. Congress intended that the federally sponsored secondary mortgage market should provide standardized mortgage instruments. J. Murray and H. Judy, *Uniform Multifamily Mortgage Instruments*, 33 Bus.Law. 2303, 2359 (1978).

Congress mandated that FHLMC and FNMA should follow certain guidelines to guarantee the quality of the mortgages handled. In 12 U.S.C. § 1719(a), FNMA is instructed:

(1) To carry out the purposes set forth in paragraph (a) of section 1716 of this title, the operations of the corporation under this section shall be confined, so far as practicable, to mortgages which are deemed by the corporation to be of such quality, type, and class as to meet, generally, the purchase standards imposed by private institutional mortgage investors.
. . .
*See also* 12 U.S.C. § 1454(a)(1).

In order to meet the Congressional mandate, FNMA and FHLMC have established several standards relating to various aspects of the mortgages they purchase. One of these standards regards the hazard insurance covering the property which secures the mortgages purchased. Both FNMA and FHLMC require that such hazard insurance be provided by a company with at least a Class VI rating in *Best's Insurance Reports.*[3] FNMA adopted this requirement in July, 1974.[4] In 1975, FNMA determined to accept mortgages covered by hazard insurance provided by companies which did not meet the appropriate standard but provided reinsurance certificates by companies which did.

Anchor, which for many years has had a similar requirement regarding the insurance policies for mortgages it created, changed its standard in 1978 from the higher Best's X rating to a Best's VI rating. Fidelity changed its standards in 1974 to the Class VI rating in light of the fact that the majority of its home loan production was originated for sale to either FNMA or GNMA.

A Class VI rating means that an insurance company has net resources of $1,500,000 to $2,500,000. Neither plaintiff is large enough to obtain a Best's Class VI rating. For that reason, unless they make suitable arrangements for reinsurance the plaintiffs are unable to provide hazard insurance coverage for property securing mortgages which defendants Anchor and Fidelity originate with the intent of selling to FNMA, GNMA, or FHLMC.

**2.** This dismissal order is now on appeal to the Tenth Circuit Court of Appeals.

**3.** The A.M. Best Company has issued reports on insurance companies since 1900. It is now the only major specialized insurance reporting and rating service in the United States. Best's provides two ratings. First is the "Financial Size Category" with which we are primarily concerned here. The second is the "Policyholders' Rating" which gives Best's opinion as to the relative permanence and safety of each company. Best's ratings are widely used in the mortgage field.

**4.** Actually, in 1974 Best's "Financial Size Category" was rated alphabetically. Thus, FNMA and FHLMC adopted a BBB+ rating. In 1976 Best's converted from an alphabetical to a numerical system and Class VI became the appropriate rating.

The plaintiffs claim that the Class VI requirement is "arbitrary and without foundation", and that its promulgation by FNMA and FHLMC and the other defendants' acts of honoring that requirement constitute a "combination and boycott" in violation of federal and state antitrust laws.

This action now comes before the Court upon the motions for summary judgment filed by remaining defendants FNMA, Anchor, and Fidelity.

## DISCUSSION

The major issue presented by the pending summary judgment motions is whether plaintiffs have a viable claim under Section 1 of the Sherman Act. Boiled down to basics, defendants' briefs argue that plaintiffs' § 1 cause of action is defective in three particulars: (1) plaintiffs cannot show concerted action; (2) plaintiffs cannot show an unreasonable restraint of trade; and (3) plaintiffs cannot show an impact upon interstate commerce.

*Summary Judgment*

■ Before discussing the legal issues presented by plaintiffs' antitrust claims, we take cognizance of the applicable procedural standards. It is familiar law that no summary judgment motion is lightly granted. Summary judgment is to be denied unless the moving party demonstrates entitlement to it beyond a reasonable doubt. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027, 1037 (10th Cir. 1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir. 1975). The court must examine all the evidence in the light most favorable to the party opposing the motion. *Mogle v. Sevier County School Dist.*, 540 F.2d 478, 482 (10th Cir. 1976) *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *Frey v. Frankel*, 361 F.2d 437, 442 (10th Cir. 1966). Affidavits are not a substitute for trial. *Madison v. Deseret Livestock Co., supra*, 574 F.2d at 1036; *Eagle v. Louisiana Southern Life Ins. Co.*, 464 F.2d 607, 608 (10th Cir. 1972). Where different inferences can be drawn from conflicting affidavits and depositions, summary judgment should be denied. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

■ The Court is aware that precautions against hasty termination of a potentially meritorious action are especially crucial in the area of antitrust. *Poller v. C. B. S., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Nevertheless, summary judgment can be appropriate even in an antitrust action should the party opposing such a motion fail to respond to a legally sufficient motion supported by affidavits with a showing of specific facts demonstrating the existence of genuine issues of material fact for trial. *Stevens v. Barnard*, 512 F.2d 866, 878 (10th Cir. 1975); *Whitfield v. Gangas*, 507 F.2d 880, 882 (10th Cir. 1974). Before granting motions for summary judgment in *Natrona Service, Inc. v. Continental Oil Co.*, 435 F.Supp. 99, 106–107 (D.Wyo.1977), *aff'd* 598 F.2d 1294 (10th Cir. 1979), Judge Brimmer of Wyoming wrote that admonitions against the granting of such motions in an antitrust case

are not warrants "for every plaintiff who can draft an antitrust complaint, no matter how groundless or improbable its allegations, to force his claim to trial despite its deficient factual underpinnings. *Murdock v. City of Jacksonville*, 361 F.Supp. 1083, 1086–87 (M.D.Fla.1973). Where the Court has permitted extensive discovery, and where the requirements of Rule 56, Federal Rules of Civil Procedure, are satisfied, the Court may properly grant a motion for summary judgment. *Umdenstock v. American Mortgage and Inv. Co.*, 495 F.2d 589 (10th Cir. 1974). Moreover, when that discovery has failed to reveal any evidence to support the plaintiffs' claims, and the record contains an overwhelming amount of evidence which contradicts the plaintiffs' conspiracy allegation and poses a variety of non-conspiratorial motives, for the defendants' acts, rooted in business judgment, the defendants are entitled to summary judgment. *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Semke v. Enid Auto Dealers' Ass'n*, 456 F.2d 1361 (10th Cir.

1972). When it becomes plain that the allegedly unlawful acts do not exist, and the plaintiffs' claims are without merit, the Court has a duty to grant summary judgment. *Capital Temporaries, Inc. v. Olsten Corp.*, 365 F.Supp. 888 (D.Conn. 1973), *aff'd*, 506 F.2d 658 (2d Cir. 1974).

Allegations which are "glib and conclusory" are insufficient to raise genuine issues of material fact once they have been specifically denied in sworn affidavits and depositions. *Kemp Pontiac-Cadillac, Inc. v. Hartford Automobile Dealers' Ass'n*, 380 F.Supp. 1382 (D.Conn. 1974). In addition, where the defendants have expressly denied by sworn testimony the plaintiffs' allegations of conspiracy to monopolize or restrain trade, "it [is] up to the plaintiffs to produce *significant probative evidence*—by affidavit or deposition—demonstrating that a *genuine* issue of fact existed as to this element of the complaint, if summary judgment is to be avoided." *Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 778, 782 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975) (Emphasis added); *ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52 (9th Cir. 1975); *Clark v. United Bank of Denver, supra.*

.      .      .      .      .

Summary judgment cannot be defeated "by the vague hope that something may turn up at trial." *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). Where, as here, the plaintiffs have failed to turn up substantial evidence in support of their conspiracy theory, and the defendants have introduced extensive and substantial evidence negating the theory, it is unreasonable to assume a trial would provide the plaintiffs with any greater opportunity to prove their theory, especially when the most that can be hoped for is to discredit the defendants' witnesses at trial. Under these circumstances, no question of fact is presented. [435 F.Supp. at 136–137]

Judge O'Connor of this District made a similar statement in *Frackowiak v. Farmers Ins. Co., Inc.*, 411 F.Supp. 1309, 1319–1320 (D.Kan.1976):

.  .  .  this case represents an instance in which "injury resulting from normal business hazards is sought to be redressable by casting the affair in antitrust terms" that simply do not fit the case. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 474, 82 S.Ct. 468, 491, 7 L.Ed.2d 458, 465 (1962) (Harlan, J., dissenting). As recently as 1968, the United States Supreme Court rejected the suggestion that "Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, 592 (1968). In that case, the Court held, "While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." *Id.*

This case has now been on file for 20 months. Much discovery in the form of depositions and interrogatories has been undertaken. Although plaintiffs protest that the pending motions are premature, they have not shown the Court that any discovery remains to be done as to *material* issues of fact which are now unresolved. None of the areas in which plaintiffs now seek to delve is relevant to the material issues presented by the pending motions. Plaintiffs have had ample opportunity to partake in discovery as to the relevant issues, and the record compiled before the Court is quite clear.

A very strong blow to plaintiffs' prematurity argument is struck by defendants' willingness to concede virtually every factu-

al allegation lodged by plaintiff, thus converting the dispute into one composed almost totally of issues of law rather than issues of fact. In its reply brief to plaintiffs' brief in opposition to the summary judgment motions, defendant Anchor wrote:

. . . while Anchor disputes the ultimate, legal conclusions of combination and of unreasonable restraint argued by plaintiffs, and while many of plaintiffs' claims are ambiguous, inaccurate and unsupportable, for purposes of this motion, we do not dispute, to paraphrase plaintiffs' own memorandum in opposition: (1) that Anchor adopted a standard which led to the creation of a standard mortgage package to be produced within Kansas for sale in the secondary market (Plaintiffs' Opposition, p. 2); (2) that plaintiffs were excluded from the hazard insurance marketplace (assuming plaintiffs chose not to avail themselves of the reinsurance option which Anchor made available) by deliberate actions, i. e., requirements of defendants (Plaintiffs' Opposition, p. 2); (3) that the identical requirements as to a Best's rating were and are used by Anchor and the other defendants (Plaintiffs' Opposition, p. 3); (4) that the secondary market for mortgages is a vital part of Anchor's business (Plaintiffs' Opposition, p. 3); (5) that the circumstances or necessity for entry into the secondary market through sales to defendant, Federal National Mortgage Association dictated compliance or conformance with a standard for hazard insurance at least equal to that of FNMA (Plaintiffs' Opposition, p. 3); (6) that plaintiffs have been excluded from the marketplace of the creation of mortgages by Anchor so long as they do not meet Anchor's standard in order, among other reasons, for Anchor to make its goods (mortgages) attractive for buyers in the secondary market without regard to the individual quality of plaintiffs' product (insurance) which everyone agrees must be a part of the goods produced for the secondary market (Plaintiffs' Opposition, p. 3) (as noted Anchor would consider whether the secondary market standards were less than necessary to meet Anchor's needs and deemed it infeasible to review the management capabilities and financial stability of every insurance company with which its customers might do business; see the Affidavit in Support of Anchor's motion); (7) that mortgagors are denied access to mortgage financing by Anchor and Fidelity, unless they accede to the terms set by Anchor and Fidelity and thereby plaintiffs are denied a chance to compete for that hazard insurance which constitutes an integral part of the mortgage package of financing (assuming they choose not to avail themselves of the reinsurance option) (Plaintiffs' Opposition, p. 4); (8) that in a number of instances mortgagors have paid more of a premium for hazard insurance than would have been paid by purchasing insurance from one of the plaintiffs (Plaintiffs' Opposition, p. 5); (9) that it is a benefit to Anchor that Anchor is able to create an instrument which is salable in the secondary market to prospective purchasers throughout the country and this constitutes a major item of its business (Plaintiffs' Opposition, p. 5); and, (10) that Anchor had reason to exclude entities which did not meet its criteria, such as plaintiffs, from writing hazard insurance on mortgages created by Anchor (assuming plaintiffs chose not to avail themselves of the reinsurance option) because, among other reasons, such exclusions made Anchor's mortgages more salable in the secondary market. (Plaintiffs' Opposition, p. 5) [Doc. # 50, pp. 5–6]

Given the facts firmly established by previous discovery and the facts admitted by moving defendants, we conclude that the motions for summary judgment are ripe for disposition.

The question presented for our resolution is clear. FNMA buys mortgages on the secondary market. Rather than examine the financial situation of the thousands of insurance companies in this country which provide hazard insurance, FNMA established an objective standard, Best's Class VI

rating, to identify acceptable hazard insurance carriers for the mortgages it purchases. A threshold size requirement was considered necessary, in part, to insure that coverage would be adequate if a major disaster occurred. In part because Anchor and Fidelity desire to sell the mortgages they originate to FNMA and FHLMC, they have also adopted the Class VI rating to make their mortgages more salable. These standards block plaintiffs out of the market, no matter how financially stable and well managed they may be. The legal issue is whether these facts establish an antitrust violation. We believe the answer is in the negative.

*Sherman Act, § 1*

As mentioned previously, the major issue presented for our consideration is whether plaintiffs have a viable claim under § 1 of the Sherman Act, 15 U.S.C. § 1, which reads, in pertinent part, as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

■ In order to prevail on a § 1 claim, a plaintiff must show (1) concerted action, and (2) an unreasonable restraint of trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *American Telephone & Telegraph Co. v. Delta Communications Corp.*, 408 F.Supp. 1075, 1088 (S.D.Miss.1976), aff'd 579 F.2d 972 (5th Cir. 1978). Additionally, in order to establish federal jurisdiction, a plaintiff must show that the restraint in question has a sufficient effect upon interstate commerce. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 783–785, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 743–745, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *United States v. Yellow Cab Co.*, 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *Bryan v. Stillwater Bd. of Realtors*, 578 F.2d 1319, 1324 (10th Cir. 1977). Defendants contend that plaintiffs' claims fall short in all three areas. We agree with defendants regarding the first two issues, and feel no need to discuss the close question of impact upon interstate commerce.

*Concerted Action.*

In order to establish the existence of the "contract, combination, or conspiracy" referred to in 15 U.S.C. § 1, a plaintiff must show:

> . . . (1) two or more persons (2) acting in concert. The second requirement, concerted action, is usually defined as referring to a consensus or agreement by the parties to act together. [16 J. Von Kalinowski, Business Organizations: Antitrust and Trade Regulations § 6.01[3], pp. 6–42 to 6–43 (1979)]

The element of concerted action is, as noted above, especially critical to a § 1 claim. *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 286 (5th Cir. 1978) cert. denied 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), emphasized:

> Essential to every § 1 offense is concert of action between separate business entities. It is axiomatic that unilateral activity by a single firm cannot be reached via this section.

*See also Card v. National Life Insurance Co.*, 603 F.2d 828, 834 (10th Cir. 1979); *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 916–917 (8th Cir. 1976); *Ford Motor Company v. Webster's Auto Sales, Inc.*, 361 F.2d 874, 878 (1st Cir. 1966).

■ The evidence in this case demonstrates that no concert of action occurred. The depositions and affidavits before the Court make it clear that defendants did not contract, combine, conspire, consult, or even communicate with one another regarding the adoption of the Best's Class VI rating requirement. Even plaintiffs have asserted that FNMA *unilaterally* adopted the Class VI standard in 1974. Later, Anchor and Fidelity independently adopted the same standard. It is not disputed that Anchor and Fidelity were motivated, at least in part, by a perceived need to make the mort-

gages they originated more salable in the secondary market.[5]

■ That FNMA unilaterally established a standard to which Anchor and Fidelity later "acquiesced" does not establish concerted action within the meaning of the Sherman Act. *Frackowiak v. Farmers Ins. Co., Inc., supra,* 411 F.Supp. at 1319. Thus, in *Polytechnic Data Corp. v. Xerox Corp.,* 362 F.Supp. 1, 8 (N.D.Ill.1973), the court noted:

> Polytechnic has alleged that Xerox has combined with certain of its lessees who have "acquiesced" in the prohibition of the attachment of devices to its machines. . . . These charges do not contain the "collaborative element" of a combination or conspiracy required by the Sherman Act. *Dart Drug Corp. v. Parke, Davis & Co., supra* [120 U.S.App.D.C. 79, 344 F.2d 173 (D.C.Cir. 1965)].

And regarding a similar context it has been written:

> . . . something more than mere acquiescence in the seller's offending policy would be required to support a finding of the existence of that agreement or understanding essential, in the absence of monopoly, to making out a violation of the antitrust laws. [Barber, *Refusals to Deal Under the Federal Antitrust Laws,* 103 U.Pa.L.Rev. 847, 859 (1955)]

■ In light of the fact that all of the direct evidence, and it is substantial, points to a conclusion that no concerted activity occurred in this case, plaintiffs ask the Court to infer such activity from the parallel actions of the defendants. Plaintiffs ask this Court to infer more than is justified by the law or the facts of this case. Conscious parallelism alone does not establish a § 1 violation. In *United States v. CIBA–GEIGY Corp.,* 1976–1 Trade Cases, ¶ 60,908, pp. 68,935, 68,960 (D.N.J.1976), the court stated simply: "Parallel business activity does not itself constitute a violation of the Sherman Act," citing *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.,* 346 U.S.

537, 541, 74 S.Ct. 257, 98 L.Ed. 273 (1954). It has been written:

> Attempts to rely upon conscious parallelism to transform unilateral refusals into an allegedly collective refusal have generally been unsuccessful. [A.B.A., Antitrust Law Developments 16 (1975)]

*See also First National Bank v. Cities Service, supra,* 391 U.S. at 287, 88 S.Ct. 1575; *Cackling Acres, Inc. v. Olson Farms, Inc.,* 541 F.2d 242, 245 (10th Cir. 1976) *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co.,* 513 F.2d 102, 110 (2d Cir. 1975); *Independent Iron Works, Inc. v. United States Steel Corp.,* 322 F.2d 656, 661 (9th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963); *Weit v. Continental Illinois Nat. Bank & Trust Co.,* 467 F.Supp. 197, 210 (N.D.Ill.1978); *Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 229 (S.D.N.Y.1978); *Raitport v. Chase Manhattan Capital Corp.,* 388 F.Supp. 1095, 1100 (S.D.N.Y.1975); Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655, 657–658 (1962).

■ Because parallel conduct in itself establishes nothing of legal significance, an antitrust plaintiff must rely upon the surrounding circumstances to establish the basis for an inference of concerted activity. Such surrounding circumstances must demonstrate two elements before concerted action may be inferred:

> . . . two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior [are]: (1) a showing of acts by defendants in contradiction of their own economic interests, *Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 297 F.2d 199 (3rd Cir. 1961), *cert. denied,* 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962); and (2) satisfactory demonstration of a motivation to enter an agreement, *First Nat'l Bank v. Cities Service*

---

**5.** Anchor claims that its Class VI requirement is also based upon its desire to protect its shareholders and depositors, this being part of

the reason why Anchor had an even higher rating requirement for many years prior to 1974.

Co., 391 U.S. 253, 287, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). [*Venzie Corp. v. United States Mineral Prod. Co., Inc.*, 521 F.2d 1309, 1314 (3d Cir. 1975)]

*See also Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 884 (8th Cir. 1978); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977) *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); A.B.A., Antitrust Developments, *supra* at 35; Turner, *supra*, 75 Harv.L.Rev. at 681.

■ Because all three moving defendants have a strong interest in requiring that the insurance company which provides hazard insurance for the property securing their mortgages is financially stable, it is certainly not "in contradiction of their own economic interests" for these defendants to establish a Class VI requirement. Nor has plaintiffs' evidence satisfactorily demonstrated a motive for defendants to enter into an agreement regarding such a requirement. Defendants are in no way economically involved in the markets in which plaintiffs compete and therefore have no motivation to wish plaintiffs good or ill.

In sum, the direct evidence in the record overwhelmingly establishes that defendants did not act in concert when they each established a Class VI requirement of hazard insurance companies. The doctrine of parallel activity does not provide a basis for a finding to the contrary. Therefore, a critical element in a 15 U.S.C. § 1 cause of action is missing in this case. Summary judgment could be granted on this basis alone, for it is clear that a mere unilateral refusal to deal does not constitute a Sherman Act violation.

*Unreasonable Restraint of Trade.*

■ Even if we were to assume for purposes of argument that the acquiescence of Anchor and Fidelity in the standards set by FNMA constituted the concerted action required by the Sherman Act, we still could not find that plaintiffs have shown a proper claim in this case. The mere fact of combination or conspiracy does not alone establish § 1 liability. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76 (9th Cir. 1969) *cert. denied*,

396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Natrona Service, Inc. v. Continental Oil Co., supra*, 435 F.Supp. at 108. Plaintiffs must also establish an "unreasonable restraint of trade."

Does defendants' conduct (assuming for argument that concerted activity has been shown) constitute an impermissible restraint of trade? It has been frequently noted that the wording of § 1 is so broad as to prohibit many kinds of perfectly normal business transactions:

> The Supreme Court has observed that if Section 1 of the Sherman Act were to be read in the narrowest possible way, any commercial contract could be deemed to violate it. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515, 524 (1972); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, 687 (1918). It is well-established, however, that the federal antitrust statutes were not intended and have not been construed to interfere with ordinary commercial practices in interstate commerce which are bona fide and not in restraint of trade. *E. g., Naifeh v. Ronson Art Metal Works, Inc.*, 218 F.2d 202 (10th Cir. 1954). [*Frackowiak v. Farmers Ins. Co., Inc., supra*, 411 F.Supp. at 1316]

*See also Associated Press v. United States*, 326 U.S. 1, 23, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (Douglas, J., concurring); *Neeld v. National Hockey League*, 594 F.2d 1297, 1298 (9th Cir. 1979); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra*, 416 F.2d at 79; *Madirosian v. American Institute of Architects*, 474 F.Supp. 628, 636 (D.D.C.1979).

■ Notwithstanding the broad wording of · § 1, the Supreme Court established early on that only "unreasonable" restraints of trade were prohibited by § 1. *Standard Oil v. United States, supra*. The "rule of reason" remains the prevailing mode of analysis under § 1. *Smith v. Pro Football, Inc.*, 193 U.S.App.D.C. 19, 24, 593 F.2d 1173, 1178 (D.C. Cir. 1979).

■ Due to the fact that application of the "rule of reason" test can be an arduous task, the courts have established a judicial shortcut by holding that various forms of trade restraints are "per se" violations of the Sherman Act. In *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178, 186 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973), the court stated:

> Certain arrangements are conclusively presumed to be unreasonable restraints of trade, simply by virtue of their obvious and necessary effect on competition. *See Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Once the existence of such an arrangement has been established, no evidence of actual public injury is required, *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), and no evidence of the reasonableness of defendant's conduct will be considered in justification. *See Northern Pacific, supra.* This rule of *per se* illegality has been applied thus far to horizontal and vertical price fixing agreements, division of markets between competitors, tying arrangements, and certain collective refusals to deal, or "group boycotts."

Group boycotts are a well established form of *per se* violative activity [*United States v. General Motors Corp.*, 384 U.S. 127, 145–146, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–213, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild v. F. T. C.*, 312 U.S. 457, 468, 61 S.Ct. 703, 85 L.Ed. 949 (1941)], and it is within this exception to the "rule of reason" that plaintiffs attempt to categorize defendants' conduct. Perhaps the most critical question presented by the pending motions is whether defendants' conduct can be considered a group boycott deserving of *per se* treatment.

Although group boycotts are generally considered *per se* violations of the Sherman Act, certain conduct which is similar to a group boycott has been validated by the courts which have held either that the activity was not a boycott or that this type of boycott was not a *per se* Sherman violation. Although the state of the law in this area is quite confused [*Cullum Elec. & Mechanical v. Mechanical Contractors*, 436 F.Supp. 418, 428 (D.S.C.1976) *aff'd* 569 F.2d 821 (4th Cir. 1978), *cert. denied* 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255], we think ample authority exists for a finding that the activity asserted in this case is not a boycott of the type condemned *per se* by the Sherman Act.

Regarding the definition of "boycott", the Supreme Court recently wrote in *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978):

> The generic concept of boycott refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target.

In the antitrust field, the "classic" group boycott has been defined as

> . . . *a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level.* Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors, by inducing customers not to buy from them, or, in some cases, by refusing to deal with would-be competitors themselves. In each instance, however, *the hallmark of the "group boycott" is the effort of competitors to "barricade themselves from competition at their own level."* It is this purpose to exclude competition that has characterized the Supreme Court's decisions invoking the group boycott *per se* rule. (emphasis added) [*Smith v. Pro Football, Inc., supra*, 593 F.2d at 1178]

*See also Alpha-Sentura Business Services, Inc. v. Interbank Card Ass'n*, 48 L.W. 2244 (D.Md. 9/11/79).

A recent analysis of the boycott law suggests that the courts have found boycotts to constitute *per se* Sherman Act violations only if they fit within one of three categories: (1) horizontal combinations to exclude competitors; (2) vertical combinations to exclude competitors; and (3) combinations designed to influence trade practices of boycott victims.[6] *Smith v. Pro Football, Inc., supra*, 593 F.2d at 1178, n. 18. *See also Worthen Bank & Trust Co. v. National Bankamericard, Inc.*, 485 F.2d 119, 124 (8th Cir. 1973); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, supra*, 467 F.2d at 186–187; *West Texas Utilities Co. v. Texas Elec. Service*, 470 F.Supp. 798, 816 (N.D.Tex.1979) C. Hills (ed.), Antitrust Adviser 34 (2d ed. 1978), Annot., 41 A.L.R.Fed. 175 § 8 (1979). The *Smith* opinion went on to state that:

> When confronted with concerted refusals to deal that do not fit the classic "group boycott" pattern, the courts almost without exception have held the *per se* rule inapplicable. [593 F.2d at 1179, n. 22]

We believe the *per se* rule inapplicable here because this case does not present activity that could be characterized as a boycott falling within one of the three categories listed above. Plaintiffs do not compete with defendants. The Class VI requirement in no way (either horizontally, vertically, or diagonally) excludes competitors from defendants' markets of competition. Nor can the Class VI requirement be said to be designed to "influence the trade practices" of the boycott victims, the plaintiffs. The Class VI requirement was not adopted by FNMA to alter plaintiffs' behavior in any fashion; rather, plaintiffs were simply beneath FNMA's notice when the standards were adopted. Absolutely no anticompetitive purpose appears to have been in any way related to the adoption of the Class VI requirement by defendants.[7]

It is important to remember that *per se* treatment of business activity is not lightly invoked:

> A court will not indulge in this conclusive presumption lightly. Invocation of a *per se* rule always risks sweeping reasonable, pro-competitive activity within a general condemnation, and a court will run this risk only when it can say, on the strength of unambiguous experience, that the challenged action is a "naked restraint[ ] of trade with no purpose except stifling competition." [*Smith v. Pro Football, Inc., supra*, 593 F.2d at 1181]

Thus, in *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the Supreme Court said that "*per se* rules of illegality are appropriate only when they relate to conduct that is *manifestly* anticompetitive."

It cannot be said that conduct is manifestly anticompetitive where, as here, absolutely no anticompetitive intent or motive existed. 16J Von Kalinowski, *supra*, at § 76.02, p. 76–11 ["Rule of reason boycotts are not inspired by anticompetitive motives."] Nor can manifestly anticompetitive conduct be found when the anticompetitive effect is, as here, merely incidental. *Neeld v. National Hockey League, supra*, 594 F.2d at 1299–1300; 16J Von Kalinowski, *supra* § 76.04[2], p. 76–41. *See also* 16J Von Kalinowski at § 76.02[1], p. 76–15:

---

6. To put this another way, in order for a boycott to constitute a *per se* violation, it must have as its purpose either the exclusion of a competitor or some other anticompetitive goal. *Alpha-Sentura Business Services, Inc. v. Interbank Card Ass'n, supra*; *Chastain v. American Telephone & Telegraph Co.*, 401 F.Supp. 151, 161 (D.D.C.1975); *Jones v. National Collegiate Athletic Ass'n*, 392 F.Supp. 295, 304 (D.Mass. 1975).

7. Plaintiffs claim that the Supreme Court's recent decision in *St. Paul Fire & Marine Ins. Co. v. Barry, supra*, 438 U.S. at 531, 98 S.Ct.

2923, substantially broadened the definition of boycott in the antitrust context. However, it appears that *Barry* merely held that a "boycott" includes at least the practice involved in that case, *i. e.*, an agreement by which one company "induced its competitors to refuse to deal on any terms with its customers." *Smith v. Pro Football, Inc., supra*, 593 F.2d at 1180, n. 22. Such a factual situation is not present here. Further, *Barry* once again made it clear that not all concerted refusals to deal are *per se* invalid. *Neeld v. National Hockey League, supra*, 594 F.2d at 1298–1299 n. 3.

The *per se* boycott rule is applicable only when the concerted action is specifically directed at third parties. The *per se* rule is not applicable when conduct only incidentally or indirectly causes a termination in trade relations with a third party.

■ Because the law is clear that *per se* treatment is not appropriate for defendants' conduct, the most plaintiffs can argue for is application of the "rule of reason." The "rule of reason" entails basically a weighing process:

Under the rule of reason, a restraint must be evaluated to determine whether it is significantly anticompetitive in purpose or effect. In making this evaluation, a court generally will be required to analyze "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." If, on analysis, the restraint is found to have legitimate business purposes whose realization serves to promote competition, the "anticompetitive evils" of the challenged practice must be carefully balanced against its "procompetitive virtues" to ascertain whether the former outweigh the latter. A restraint is unreasonable if it has the "net effect" of substantially impeding competition. [*Smith v. Pro Football, Inc., supra*, 593 F.2d at 1183]

Even were the "rule of reason" to be applied, plaintiffs must fail. On the one hand, plaintiffs have not demonstrated that the anticompetitive effects of the Class VI requirement would be significant at all in terms of the impact upon the relevant market. This is especially so in light of the fact that plaintiffs have full access to the market if they merely use reinsurance certificates.

On the other hand, Congress has mandated that FNMA accept only mortgages which are "of such quality, type, and class" as to meet the standards of institutional investors. Further, FNMA is to promote uniformity in the field. Use of a standard governing hazard insurance promotes both those goals. Utilization of an objective standard is obviously necessary when one considers the tremendous volume of business being done in this area. In 1978, FNMA purchased 311,002 mortgages with an unpaid balance of $12,301,650,000. Anchor sold $16,478,360 worth of mortgages to FHLMC in 1978. Fidelity has approximately $140,000,000 in the mortgage portfolio which it services, about $62.8 million of this has been sold to FNMA or GNMA. With this volume of business, it is not feasible to adopt plaintiffs' suggestion that each insurance company be analyzed individually. This would be a costly and time-consuming process for there are over two hundred companies competing in the hazard insurance market in Kansas alone.

Plaintiffs claim that they are well-managed and therefore more sound financially than some companies larger in size. This may be true. However, if defendant FNMA reduced its standard to a smaller classification to include plaintiffs, or switched to reliance upon Best's "Policyholders' Rating", or made some other such adjustment, there would always be some other company which could sue making the same arguments which plaintiffs lodge in this case.

The standard applied by defendants is reasonable. It serves a legitimate business interest and is therefore not offensive to the Sherman Act. *Neeld v. National Hockey League, supra*, 594 F.2d at 1300; *Polytechnic Data Corp. v. Xerox Corp., supra*, 362 F.Supp. at 6, 8; *Nankin Hospital v. Michigan Hospital Service*, 361 F.Supp. 1199, 1207 (E.D.Mich.1973).

■ So long as the defendants' actions are reasonable, they need not constitute the "least restrictive alternative" available. *Foster v. Md., State Sav. & Loan Ass'n*, 590 F.2d 928, 935 (D.C. Cir. 1978), *cert. denied*, 439 U.S. 1071, 99 S.Ct. 842, 59 L.Ed.2d 37 (1979); *American Motor Inns v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3d Cir. 1975); *Newberry v. Washington Post Co.*, 438 F.Supp. 470, 475 (D.D.C.1977).

We agree with defendants that plaintiffs' arguments reveal the fact that the real nub of plaintiffs' complaint is not an antitrust

claim at all. Rather, plaintiffs simply feel that defendants have made a mistake in adopting a standard which precludes dealing with two such reliable companies as plaintiffs. Unfortunately for plaintiffs' position, bad business judgment does not constitute a Sherman Act violation. *Natrona Service, Inc. v. Continental Oil Co., supra,* 435 F.Supp. at 110. Plaintiffs' remedy is not to being an antitrust action, but to present their case to FNMA's board of directors. Plaintiffs stand in the shoes of any company which has lost an account. They need to send a salesman to attempt to get it back.

■ Upon contemplation, the Court concludes that the record in this case shows nothing more than unilateral refusals to deal which do not constitute Sherman Act violations. FNMA has chosen a Class VI requirement because it suits FNMA's need for a uniform, objective standard. Anchor and Fidelity have chosen the same requirement in part because it makes their product more attractive to potential purchasers. Defendants have chosen to deal with larger insurance companies. They have not chosen to deal with plaintiffs unless plaintiffs utilize reinsurance. These are independent decisions which defendants can make with impunity under the antitrust laws. It was established long ago that a company has the right to choose with whom it will deal and on what terms. In *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), the Supreme Court said:

In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

*See also Fuchs Sugar & Syrups, Inc. v. Amster Corp.,* 602 F.2d 1025, 1030 (2d Cir. 1979); *Lamb's Patio Theatre v. Universal Film Exchanges,* 582 F.2d 1068, 1070 (7th Cir. 1978); *Oreck Corp. v. Whirlpool Corp.,*

579 F.2d 126, 133 (2d Cir. 1978) *cert. denied,* 439 U.S. 1104, 99 S.Ct. 883, 59 L.Ed.2d 65; *Anaya v. Las Cruces Sun News,* 455 F.2d 670, 672 (10th Cir. 1972); *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir. 1971); *Natrona Service, Inc. v. Continental Oil Co., supra,* 435 F.Supp. at 108; *Frackowiak v. Farmers Ins. Co., Inc., supra,* 411 F.Supp. at 1317.

The courts have upheld refusals to deal on a myriad of grounds. In A.B.A., Antitrust Law Developments, *supra* at 22–23 (and Supp.), it was noted:

Thus, individual refusals to deal have been upheld when based upon the failure of a distributor to live up to the supplier's preferred quality type image, when reliable security for payment has not been given or payments have not been made, when the refusal was based on a chronic history of customer complaints, when competitive products were sold by a customer at lower prices or lower prices were available from other suppliers, when a customer would not enter into a 5-year contract, when the "refusal was based on the supplier's belief that his company had been treated badly," when the refusal to deal was initiated because of a refusal by distributors to supply a newspaper with a list of its subscribers, when a manufacturer decided to choose his own distributor or establish his own exclusive outlet, when a coupler manufacturer's policy was to sell only to original equipment manufacturers or to subcontractors who manufactured components directly for them, and when the transfer from one distributor to another has been solicited by the new distributor, [w]hen a hospital did not meet an insurance company's standards designed to promote the public welfare, when the refusal was motivated by a supplier's decision to abandon a geographic market, when a supplier changed his policy and initiated a nationwide cutback in the number of dealers for its products, when a commercial loan was denied because of the applicant's inadequate financial resources and managerial qualifications, when a distributor provided inadequate sales performance in an

area of primary responsibility, when a refusal to continue to supply market research data was intended to prevent the disclosure of proprietary trade secrets to a customer who had become a competitor, when a refusal was based on a curtailment of noncontractual customers during a period of shortage, and when a distributor engaged in misbranding activities. [footnotes omitted]

Defendants' actions in this case are as legal and reasonable as those just listed. It is not for this Court to substitute its judgment for the business judgment of defendants. Plaintiffs have been unable to present any authority which supports the positions they assert in any similar legal context. The cases which are factually similar to the case at hand are all in defendants' column.

A very similar case is *Shawver & Sons, Inc. v. Oklahoma Gas & Electric Company*, 463 F.2d 204 (10th Cir. 1972), in which an owner directed its general contractors not to hire a certain subcontractor in their work for the owner. The subcontractor brought an antitrust action. The 10th Circuit had no trouble affirming the trial court's decision to grant defendant's motion for summary judgment, stating:

> Case law interpreting antitrust statutes has established that in the absence of any purpose to create or maintain a monopoly, anti-trust laws do not restrict the right of any concern to deal with whom it pleases. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Naifeh v. Ronson Art Metal Works*, 218 F.2d 202 (10th Cir. 1954). [463 F.2d at 205]

In *Kendall Elevator Co., Inc. v. LBC&W Associates of S.C., Inc.*, 350 F.Supp. 75 (D.S.C.1972), defendant prepared architectural specifications for a building which required that the elevator supplier should be a manufacturer of major components "or equal". Plaintiff installed elevators, but was not a manufacturer and was therefore precluded from meeting the specifications. The plaintiff's antitrust claim was rejected. The court stated:

> As a general rule, a unilateral refusal to do business does not violate the antitrust laws so long as there is no purpose to create or maintain a monopoly. . . .
>
> The manufacturer of a product may select his customers and has the right to refuse to deal with anyone so long as such refusal is not in furtherance of a restrictive trade practice. An architect certainly has the same right. [350 F.Supp. at 78]

In a similar case, *Security Fire Door Company v. County of Los Angeles*, 484 F.2d 1028 (9th Cir. 1973) a plaintiff claimed an antitrust conspiracy among a county, its architects, and the supplier of a dumbwaiter system because the specifications for a county hospital construction project allegedly excluded all competition. The court rejected plaintiff's claim, holding:

> Once a purchaser's choice of product has been exercised competition is, of course, at an end. However, a purchaser is free to choose the product he desires without rendering himself an antitrust conspirator. The proscription against restraint of trade in this context seeks only to assure that the choice of product has been made freely under circumstances where the play of competition has been available rather than in response to anticompetitive factors such as coercion on the part of the supplier or agreements between suppliers not to compete with each other. [484 F.2d at 1030]

Plaintiffs are free to attempt to persuade FNMA to adopt a Best's classification which would not exclude them. Plaintiffs do not allege that insurance companies with a Best's VI classification have influenced defendants to adopt a classification which would exclude plaintiffs. The fact that no competitor of plaintiffs is a defendant in this action and that defendants have absolutely no competitive interest in the markets in which plaintiffs compete serves to highlight the inappropriateness of an antitrust cause of action in this factual situation.

In summary, we believe that plaintiffs are misusing the antitrust statutes by at-

tempting to apply them to conduct which is obviously permissible and not anticompetitive. No § 1 Sherman Act violation can be found upon the allegations and facts presented in this case.

*Other Claims*

Plaintiffs have also lodged a § 2 Sherman Act claim and state antitrust law claims.

As defendants point out, and plaintiffs tacitly concede, a § 2 Sherman Act claim is not even properly alleged in this case. 15 U.S.C. § 2 prohibits the actions of those who monopolize, attempt to monopolize, or conspire to monopolize. Plaintiffs do not and cannot contend that the adoption of a Class VI requirement by defendants was an attempt by any of them to gain a monopoly in its particular market.

Because plaintiffs cannot show either a § 1 or § 2 claim under the Sherman Act, any pendent claims that state antitrust laws have been violated should be dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Prince v. Wallace*, 568 F.2d 1176, 1178 (5th Cir. 1978); *Hodge v. Mountain States Tel. & Tel. Co.*, 555 F.2d 254, 261 (9th Cir. 1977); *Stevens v. Rock Springs National Bank*, 497 F.2d 307, 310 (10th Cir. 1974).

## CONCLUSION

Upon consideration of the entire record, the Court has no difficulty in reaching the conclusion that the motions for summary judgment must be granted.

IT IS SO ORDERED.